IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**KENNETH PEYTON BRYANT**                                                                 **PLAINTIFF**

VS.                                                                 CAUSE NO. 3:20CV221-MPM-RP

**CITY OF SOUTHAVEN, MISSISSIPPI**                                                 **DEFENDANT**

## ORDER

This cause comes before the court on the motion of defendant City of Southaven for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Kenneth Bryant has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is an Americans With Disabilities (ADA) and First Amendment retaliation action arising out of plaintiff's termination as a police officer by the City of Southaven on June 4, 2019. In describing his alleged disability, plaintiff asserts in his complaint that "[b]ecause of false allegations that Plaintiff had sex with an informant, and because of being involved in a police-related shooting, [he] was diagnosed with post-traumatic stress disorder ("PTSD") by Nurse Practitioner Erin Harrell." [Amended complaint at 2]. Plaintiff took leave under the Family and Medical Leave Act ("FMLA") from November 2018, until February 2019 because of this alleged disability, which, it initially appeared, would require extensive accommodation from his employer in order to allow him to return to

1

work. In its brief, defendant describes the nature of the accommodation cited as necessary by Nurse Harrell as follows:

> On January 7, 2019, Plaintiff's initial return to work letter from his nurse practitioner, Erin Harrell, stated that certain accommodations would be required for him to return to work. Ms. Harrell indicated that "the main stipulation of his return to work is that he not be required to wear a uniform or be in a position where he is made to function as an officer alone with a female subject." Ms. Harrell also indicated that "it would be detrimental to his health to work night shifts." She recommended that he be allowed to return to a position that requires him to work days only.

[Summ. Judg. Brief at 3 (record citations omitted).].

Defendant asserts that it made extensive efforts to find work meeting Nurse Harrell's specifications, writing that:

> Southaven Chief Administrative Officer Chris Wilson and Chief Pirtle reviewed the letter and informed Plaintiff, both by phone and by letter, that the City would consider options available for Plaintiff's return to work within his restrictions. Plaintiff's position as Patrol Lieutenant required him to wear his police uniform and to work around females. He also worked the night shift. Because his limitations precluded him from working in his previous position of Patrol Lieutenant, Wilson reviewed other open positions to locate a similar position for Bryant. There were no open lieutenant positions that would accommodate Plaintiff's restrictions of not wearing a uniform, not working nights, and not working around a female. Wilson did locate two sergeant positions, one in the Criminal Investigations Division ("CID"), and one in the Special Investigations Division ("SID"). These positions did not require a uniform and worked on the day shift. While the City could not guarantee that Plaintiff would never be alone with a female, it did offer these positions as possible accommodations. The City looked forward to Plaintiff's return to work and were seeking to meet all work restrictions required by NP Harrell.

[*Id.* at 3-4].

Defendant contends that plaintiff not only refused the offered sergeant positions but that he cynically sought to manufacture the opening of a lieutenant's position by providing damaging information against a fellow officer who occupied such a position at the time. Specifically, defendant writes that:

> When Wilson offered Plaintiff these two positions, Plaintiff refused them both because sergeant positions pay less than lieutenant positions. Wilson explained that the City did not have any open lieutenant positions within Plaintiff's restrictions. In response, Plaintiff asked that if any lieutenant positions within his restrictions became available, would he be eligible for that position. Plaintiff then produced a seven second video of Brett Yoakum, the then lieutenant in narcotics, that appeared to show Yoakum snorting a powder in his nose. Plaintiff indicated that he believed that the SID lieutenant position would now be open and said that he wanted to be placed in that position. Bryant testified that he did not recall making that statement, but did not deny it. He said he provided the six-year old video that he had maintained on his personal phone so that he would not have to work under Lt. Yoakum in the narcotics division, one of the positions that had been offered. Wilson advised Plaintiff that the police department would be looking into the video, but that the narcotics lieutenant's position was not open at this juncture. Plaintiff chose to remain on paid leave after the initial meeting on January 14 and until he could return to work.

[*Id.* at 4].

As indicated by defendant's arguments quoted above, the parties disagree strongly about the nature and significance of plaintiff's actions in turning in the video of Lt. Yoakum. In his complaint, plaintiff alleges that:

> Plaintiff did turn in the video, but Plaintiff explained, when he did so, that the substance was not a prescribed substance, and was not an illegal substance, and Plaintiff was merely demonstrating that he did not want to work under Yoakum because of Yoakum's poor judgment. Plaintiff had no intention of affecting Yoakum's employment, but wanted only to show that

> he did not want to work as a sergeant under Yoakum because of Yoakum's poor judgment.

[*Id.* at 3]. Plaintiff thus concedes that he knew that the videotape did not depict Yoakum engaged in any illegal activity, and, for its part, defendant takes issue with plaintiff's contention that he was simply trying to ensure that he did not have to work under that officer.

In its brief, the City writes that its investigation "concluded that Yoakum was inhaling pixie stick powder, possibly on a wager over which officer would buy lunch" and that the allegations of policy violations against him were without merit. [*Id.* at 5]. The City further concluded that plaintiff's actions in turning in the video of Yoakum represented a malicious act of hardball office politics which demonstrated his lack of loyalty to fellow officers and his unfitness to serve as a police officer. Police Chief Pirtle recommended that plaintiff be terminated on the basis of what is commonly referred to as the Department's "conduct unbecoming of an officer" policy, and the City considered his recommendation at a Board of Aldermen meeting on June 4, 2019. Plaintiff and his attorney were present at the meeting and presented testimony.

After considering the evidence presented, all members of the Board of Aldermen present at the meeting voted in favor of plaintiff's termination. Feeling aggrieved, plaintiff filed the instant lawsuit, and defendant presently seeks

summary judgment, arguing that there are no genuine issues of fact regarding its potential liability in this case and that it is entitled to judgment as a matter of law.

This court considers first defendant's motion to dismiss plaintiff's claims under the Americans With Disabilities Act (ADA). To establish a viable claim for discrimination under the ADA, a plaintiff must establish (1) that she is an individual with a disability, (2) that she was a "qualified individual" for her job, despite her disability, and (3) that she was discharged because of her disability. *Carmona v. Southwest Airlines, Co.,* 604 F.3d 848, 854 (5th Cir. 2010). If the plaintiff satisfies each of these elements, the employer must come forward with legitimate, non-discriminatory reasons for its termination decision. *Adeleke v. Dallas Area Rapid Transit,* WL 3655341, *1 (5th Cir. Aug. 27, 2012). Plaintiff then bears the burden to show that these reasons are a pretext for discrimination or are only some of the reasons for its conduct and another motivating factor is the plaintiff's protected characteristic. *Id.*

In seeking dismissal of plaintiff's ADA claim, defendant relies primarily upon an argument that he has failed to present adequate proof that he suffered from a "disability" within the meaning of the Act. In setting forth this argument, defendant faces very considerable legal headwinds, since 2008 revisions set forth in the ADA Amendments Act (ADAAA) make it exceedingly easy for plaintiffs to demonstrate that they are "disabled" within the meaning of the Act.

Prior to the enactment of the ADAAA, much of the litigation under the ADA dealt with the issue of whether a particular plaintiff was "disabled" for purposes of the ADA. However, Congress made it clear in the ADAAA that "the definition of disability ... shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted." 42 U.S.C. § 12102(4)(A). Moreover, while a plaintiff is still required to demonstrate an "impairment that substantially limits one or more major life activities of such individual," the ADA, as amended, makes it clear that the "term 'major' shall not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(i)(2).

In the court's view, perhaps the most significant amendment to the ADA involves the relaxing of the requirements as to whether an individual is "regarded as" having a disability under the ADA. This "regarded as" provision is the third prong of the ADA, which defines a disability as either: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Miller v. McHugh*, 814 F. Supp. 2d 299, 312 (S.D. N.Y. 2011). One commentator has noted the significance of the amendments to the "regarded as" prong, writing that:

> Under the third "regarded as" prong, a person does not need to have a disability to be covered if the employer discriminated against a person for having an actual or perceived physical or mental impairment. Under the pre-ADAAA law, plaintiffs had to prove that the employer thought that the

6

> plaintiff met every element of disability for purposes of the ADA.... Suffice to say, the ADAAA makes the "regarded as" prong not only easier to understand and prove, but will potentially mean that "regarded as" liability will play a much larger role in future ADA litigation.

Jeffrey M. Hirsch, Mastering Employment Discrimination Law, § 12.1. It is thus apparent that the ADAAA was specifically enacted to lessen the plaintiff's burden of proof on multiple prongs of the Act's "disability" requirement. Without question, this fact makes defendant's burden in seeking summary judgment far more onerous than it would have been under the original ADA.

Defendant's attempts to dispute that it regarded plaintiff as disabled are also made more difficult by the fact that it concedes in its brief that it made efforts to accommodate some unspecified condition relating to plaintiff, while seeming to go to great lengths to avoid saying what it regarded that condition as being. Specifically, defendant writes in its brief that:

> On January 7, 2019, Plaintiff's initial return to work letter from his nurse practitioner, Erin Harrell, stated that certain accommodations would be required for him to return to work. Ms. Harrell indicated that "the main stipulation of his return to work is that he not be required to wear a uniform or be in a position where he is made to function as an officer alone with a female subject." Ms. Harrell also indicated that "it would be detrimental to his health to work night shifts." She recommended that he be allowed to return to a position that requires him to work days only.
> Southaven Chief Administrative Officer Chris Wilson and Chief Pirtle reviewed the letter and informed Plaintiff, both by phone and by letter, that the City would consider options available for Plaintiff's return to work within his restrictions. Plaintiff's position as Patrol Lieutenant required him to wear his police uniform and to work around females. He also worked the night shift. Because his limitations precluded him from working in his

> previous position of Patrol Lieutenant, Wilson reviewed other open positions to locate a similar position for Bryant.
>
> There were no open lieutenant positions that would accommodate Plaintiff's restrictions of not wearing a uniform, not working nights, and not working around a female. Wilson did locate two sergeant positions, one in the Criminal Investigations Division ("CID"), and one in the Special Investigations Division ("SID"). These positions did not require a uniform and worked on the day shift. While the City could not guarantee that Plaintiff would never be alone with a female, it did offer these positions as possible accommodations.

[Brief at 3-4, record citations omitted].

In the court's view, it is noteworthy that, in the last sentence quoted above, defendant merely writes that it offered "these positions as possible accommodations," rather than "accommodations for plaintiff's alleged disability." The latter frankly strikes this court as a more reasonable description of defendant's actions. Indeed, while defendant seems to be avoiding this issue, it becomes even more difficult for it to deny that there are at least fact issues regarding whether it "regarded" plaintiff as disabled when it concedes that it took actions which seem quite consistent with those taken by employers who believe that an employee is a disabled individual as to whom a "reasonable accommodation" is legally required.

Later in its brief, defendant writes that:

> In this case, Plaintiff has no evidence to support that he was regarded as disabled. Southaven continued to employ Plaintiff as a police officer after he filed a workers' compensation claim for his PTSD condition and took multiple weeks off for FMLA leave. When he returned, Southaven considered his request to return to work, looked for and offered jobs that met initial restrictions provided by NP Harrell and, when those restrictions were lifted, placed him back in the same position that he had worked prior to

8

his taking time away from work for his PTSD condition. He worked from mid-January until his termination on June 4, 2019 before being dismissed. Southaven's conduct establishes as a matter of law that Southaven did not regard him as disabled.

[Brief at 9]. As with defendant's previously-quoted arguments, these actions which the City concedes it took seem quite consistent with those taken by employers who regard their employee as disabled. This leaves defendant in a rather poor position to argue that there are not at least jury issues as to whether it "regarded" plaintiff as disabled in this case.

This court concludes that the existence of triable jury issues regarding whether the City "regarded" plaintiff as having a disability is also demonstrated by its actions in demanding that he turn in his service weapon while he was on FMLA leave. As to this issue, plaintiff writes in his brief that:

> After Bryant turned in his FMLA request for leave because of PTSD, Major Allred called Bryant and told him he had to turn in his weapons. Bryant knew other officers who went on FMLA leave were not required to turn in their weapons, so he asked him why. Major Allred responded that they did not want him to do anything crazy. Major Allred also required Bryant to turn in his car and his phone.
>
> During his deposition, Major Allred admitted that he knew that Bryant was going on FMLA leave because he had PTSD. When Major Allred was asked why he asked Bryant to turn in his weapon and car, he responded, "Because I was instructed by Chief Pirtle to take his weapons and have him turn in his patrol unit." Chief Pirtle told Major Allred the reason he wanted him to get Bryant's weapons was because Chief Pirtle "did not want anything to happen to him with our weapons." Major Allred also admitted that female officers who go on maternity leave are not asked to turn in their weapons. In fact, Major Allred was not aware of any other officer being

asked to turn in his/her weapon when going on FMLA leave, other than Bryant with his PTSD.

[Brief at 8-9].

In contending that he was "regarded" as disabled by his fellow officers, plaintiff also cites evidence that his supervisors expressed concern that his PTSD might cause him to do something rash and/or unlawful with his weapon. Specifically, plaintiff writes that:

> Further, while out on FMLA leave, Bryant received a call from his supervisor, Captain Crite, who told him that then-Captain Mark Little compared Bryant to the veteran with PTSD that killed famed marine sniper Chris Kyle. Captain Little questioned whether Bryant should even own a firearm since he had been diagnosed with PTSD. During his deposition, Captain Crites confirmed that Captain Little had compared Bryant to the person who killed Chris Kyle, and was not sure he would be able to carry a firearm any longer. Captain Little admitted that he compared Bryant to Chris Kyle's killer because they both had PTSD.

[Brief at 9]. In its reply brief, the City does not deny that two of plaintiff's superiors did, in fact, express concerns regarding whether his PTSD might cause him to take unlawful actions, writing that "the comments attributed to Little referenced discussions between two captains not involved with the termination decision." [Reply brief at 3-4].

In the court's view, the evidence discussed above is more than sufficient, particularly under the very lenient ADAAA standard, to create jury issues regarding whether the City "regarded" plaintiff as disabled. In so concluding, this court notes that the City seeks to dismiss the conversations regarding plaintiff's

PTSD by his supervisors, since they were "not involved with the termination decision." *Id.* However, the City concedes that the Board of Aldermen acted based on Chief Pirtle's recommendation, and there is significant evidence that Pirtle shared his captains' concerns regarding plaintiff's mental competency. Indeed, as discussed previously, when Major Allred was asked during his deposition why he asked Bryant to turn in his weapons, he responded, "[b]ecause I was instructed by Chief Pirtle to take his weapons" because Pirtle "did not want anything to happen to him with our weapons." [Allred depo. at 13].

In light of the foregoing, this court concludes that there is a considerable amount of evidence that the City regarded plaintiff as not only suffering from a mental disability, but a very significant one. Moreover, this court concludes that the issue of whether the accommodations offered by the City for plaintiff's real or perceived disability were legally sufficient are for a jury to decide, since this issue necessarily turns upon fact-dependent issues such as what positions were available at the time and how genuine the City's efforts were to find a place for him.

This court further concludes that the question of whether the City's concerns regarding plaintiff's turning in the video of Officer Yoakum were the genuine reason for his termination is for a jury to decide. In so stating, this court notes that determining a defendant's motivations for taking a particular action is a task which a jury is uniquely well-suited to perform, and it does not regard plaintiff's actions

in turning in the Yoakum video as constituting so strong a reason for termination as to justify this court deciding this issue as a matter of law.

In so stating, this court acknowledges that a jury may well regard plaintiff's actions *vis a vis* Yoakum as rather cynical acts of Machiavellian office politics which reflect poorly upon him as a police officer and a human being. Moreover, a jury may well conclude that the accommodations sought by plaintiff were greater than those legally required and that a police officer who was unable to wear a uniform or be alone with women should have found another line of work. At the same time, plaintiff does at least have a jury argument that it is unbecoming for an officer such as Yoakum to simulate illegal drug use, and that, by reporting his actions, plaintiff was simply bringing relevant facts to his superiors' attention. Moreover, the rather close time proximity between plaintiff's taking disability leave and his eventual termination might lead a jury to conclude that concern regarding his mental status was the genuine reason for his termination and that the issues surrounding the Yoakum video were merely a pretext.

In the court's view, the seriousness of the apparent concerns regarding plaintiff's mental status among his supervisors makes it seem even more plausible that a jury would conclude that he was terminated based on his real or perceived mental disability. Considering the evidence in this case, a jury might well conclude that there were widespread concerns among plaintiff's supervisors that he

was a mentally ill individual who could not be trusted with his service weapon, and this strikes this court as a concern which might well have motivated his termination.[1] Defendant's motion to dismiss the ADA claim raised by plaintiff will therefore be denied.

This court now turns to defendant's motion to dismiss the First Amendment retaliation claim asserted by plaintiff in this case. Public employees are not stripped of their First Amendment right to freedom of expression by virtue of their employment. *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Rather, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern." *Davis v. McKinney*, 5118 F.3d 304, 311 (5th Cir. 2008). In order to prevail on a First Amendment retaliation claim, a public employee must establish that: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse action. *Modica v. Taylor*, 465 F.3d 174, 179-80 (5th Cir. 2006).

---

[1] This court notes that, in his brief, plaintiff provides further evidence of pretext on the part of the City, including the manner in which it handled the investigation into allegations against him. This court concludes that this evidence essentially constitutes "overkill" in the summary judgment context, however, since there are sufficient triable jury issues regarding the true reason for plaintiff's termination even without such evidence.

In the court's view, there are multiple, independently-sufficient reasons why plaintiff's actions in turning in the Yoakum video did not constitute First-Amendment protected conduct. This court initially notes that, under plaintiff's own version of events, he was motivated by a desire to not have to work under Yoakum, and this clearly reflects a personal motivation for his actions, unrelated to any desire to provide the public with useful information about public servants. Indeed, this court would not be at all surprised to see a jury accept defendant's interpretation of plaintiff's actions, namely that he was trying to make Yoakum lose his lieutenant's position so that he could take the job for himself. Given that plaintiff was actively trying to find a lieutenant's position for himself at the time, and considering that he had "sat" on the Yoakum video for years, this court does not regard the City's version of events as being at all implausible.

This court is required, at this juncture, to view the facts in the light most favorable to plaintiff, and it will therefore accept as accurate his representation that he turned in to Yoakum video to avoid having to work under him. Even granting plaintiff this factual inference, however, his actions would still reflect a motivation of personal gain, unrelated to informing the public discourse, which clearly harms his efforts to assert a First Amendment claim in this context. This conclusion is further supported by the manner in which plaintiff released the video, namely by

appearing to "save it for a rainy day," when it would benefit him personally the most.

This court agrees with defendant that, if plaintiff were interested in providing useful information to the public, then he would have, most likely, immediately released the video in a manner calculated to actually reach the community as a whole. Plaintiff failed to do so. Plaintiff's admission that he knew that the Yoakum video did not depict illegal drug use further weakens his argument that an issue of public concern was involved in this context. Indeed, while this court would tend to agree that a police officer using drugs is a matter of public concern, it does not believe that the same can be said for simple horseplay by an officer in simulating drug use.

This court therefore concludes that no matter of public concern was implicated by the Yoakum video, and it further concludes that plaintiff acted in his capacity as police officer, and not a public citizen, in releasing it. This constitutes an additional fatal defect in his First Amendment retaliation claim, since it is well settled that "when a public employee speaks pursuant to [his] official duties, [he] does not speak as a citizen and [his] statements are not entitled to constitutional protection." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d

689 (2006).² Even if, as plaintiff contends, he merely wanted to avoid working under Yoakum, his actions in reporting alleged misconduct by a follow officer, with a stated goal of influencing staffing decisions by his superiors, clearly constitutes actions which he took in his capacity as police officer, and not as a public citizen. This court therefore concludes that there are multiple reasons why a First Amendment retaliation claim does not exist in this case, and defendant's motion to dismiss this claim will therefore be granted.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted as to plaintiff's First Amendment retaliation claim and denied as to his ADA claim.³

This, the 18th day of January, 2022.

/s/ Michael P. Mills
U.S. DISTRICT JUDGE

---

² This court additionally notes that even when an employee does speak as a citizen on a matter of public concern, he might lack constitutional protection for such statements, if they tend to unduly harm the efficient operations of the governmental defendant. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This court believes that, given the inflammatory nature of plaintiff's accusations, the operation of the *Pickering* balancing test would likely bar his First Amendment retaliation claim even if there were not multiple other reasons for its lacking merit.

³ Plaintiff has withdrawn his previously-asserted FMLA claim. [Brief at 30].